E-FILED
Friday, 13 August, 2021 10:19:12 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES WADE WAGNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-CV-01208-JBM-JEH |
| | ) | |
| TAZEWELL & PEORIA RAILROAD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT TAZEWELL & PEORIA RAILROAD, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE THE EXPERT WITNESS TESTIMONY OF DR. LAUREN RASMUSSEN**

Defendant, Tazewell & Peoria Railroad, Inc. ("TZPR"), by its counsel, Thompson Coburn LLP, for its Memorandum in Support of its Motion to Strike the Expert Witness Testimony of Dr. Lauren Rasmussen, states as follows:

## INTRODUCTION

On January 7, 2019, Plaintiff Charles Wagnon was operating the tugboat M/V Zeus on the Illinois River, when it struck the bridge span of the Peoria & Pekin Railway bridge ("P&PU bridge") as it lowered. Plaintiff filed the instant action against TZPR, claiming that the TZPR bridge tender was negligent because he prematurely lowered the bridge and caused the allision. Plaintiff alleges he has post-traumatic stress disorder ("PTSD"). (Doc. 1, par. 4, par. 16, incorporated by reference into Doc. 4, par. 2).

TZPR seeks to exclude a portion of the expert opinion expressed by Plaintiff's expert Dr. Lauren Rasmussen in this cause. Dr. Rasmussen's methodology regarding his PTSD diagnosis for this Plaintiff is unreliable and unverifiable. Dr. Rasmussen's diagnosis violates Fed. R. Evid. 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and should not be admitted.

## FACTS

Plaintiff disclosed Dr. Lauren Rasmussen, clinical psychologist, as an expert in this matter. *Exhibit A, Plaintiff's Supplemental Rule 26 Disclosures.* Her areas of testimony include diagnosing Plaintiff with PTSD following the alleged occurrence on January 7, 2019. *Id*, p.1. Dr. Rasmussen was deposed on January 15, 2021 as a treating psychologist (Exhibit B) and again on May 4, 2021 as a retained expert (Exhibit C).

Dr. Rasmussen initially became involved when Plaintiff's employer asked Dr. Rasmussen "to evaluate him and give a diagnostic impression and treatment recommendations." *Exhibit B, p.8:4-16*.

### A. FACTUAL BASES FOR DR. RASMUSSEN'S PTSD DIAGNOSIS

Dr. Rasmussen saw Plaintiff twice as a treater. *Exhibit B, p.6:24-p.7:6, p.23:15-19*. Dr. Rasmussen saw Plaintiff for the first time on February 4, 2019, approximately one month after the occurrence at issue. *Exhibit B, p.8:22-p.9:2*. At that time, Dr. Rasmussen performed the following testing of Plaintiff:

- Alertness Questionnaire
- Minnesota Multiphasic Personality Inventory test ("MMPI")
- NSB Orientation
- Memory test
- Wide Range Achievement Test
- Detailed Assessment of Posttraumatic Stress

*Exhibit B, p.11:16-p.12:18*. Dr. Rasmussen testified that **this is a standard battery of tests for a psychological assessmen**t. *Exhibit B, p.13:1-4*. Dr. Rasmussen testified that the MMPI assesses personality and emotional functioning, and Plaintiff's results were entirely within normal limits *Exhibit B, p.13:5-20*.

Q. Okay. In any event, to kind of go to the end on this, based on your psychological evaluation, did he meet the criteria for diagnosing post-traumatic stress syndrome at that time?

A. He did not.
Q. Okay. And why is that, Doctor?
A. Because after a interview **and assessment,** he did not satisfy all of the criteria needed. He needs a certain amount of symptoms and he didn't have it. He wasn't asymptomatic, but it wasn't at the threshold consistent with post-traumatic stress disorder.
Q. So you concluded, as I understand, again, looking at your report, it says, "Mr. Wagnon does not meet the criteria for post-traumatic stress syndrome, PTSD," correct?
A. Correct.

*Exhibit B, p.15:1-17; see also Exhibit B, p.17:22-p.18:3* (He did not meet the DSM-5 criteria for PTSD).

The next day, on February 5, 2019, Dr. Rasmussen talked with Plaintiff and his wife by phone and told him it was her recommendation that he could return to work and that he was not disabled. *Exhibit B, p.19:13-20.*

Dr. Rasmussen next saw Plaintiff on January 10, 2020, almost a year later. *Exhibit B, p.20:14-17*. It was her understanding that Plaintiff had gone back to work and had been working through December 18, 2019. *Exhibit B, p.20:18-21*. At this visit, **Dr. Rasmussen did not perform any written testing on Plaintiff** like she did at the first visit. *Exhibit B, p.20:22-p.21:2, p.23:20-23, p.31:24-p.32:2*. "I didn't feel that I needed to give a checklist of DSM symptoms. I just ran through them in my mind while I was assessing his reported symptoms." *Exhibit B, p.21:6-8*. Despite this, she believed Plaintiff had PTSD as of January 14, 2020. *Exhibit B, p.28:14-17*. Dr. Rasmussen had not seen any medical records from any other provider. *Exhibit B, p.5:24-p.p.6:6.*

In her treatment of Plaintiff, Dr. Rasmussen referred Plaintiff to Dr. Anderson for eight to twelve counseling sessions to address his anxiety and hopefully return to work. *Exhibit B, p.21:9-p.22:14*. As a treater, Dr. Rasmussen never received any record or report from Dr. Anderson regarding his treatment of Plaintiff. *Exhibit B, p.22:6-9, p.27:7-11*. Nor had she read

any of the depositions taken in this case when she was deposed as a treater. *Exhibit B, p.6:12-15*. The only thing she had seen was her own records and testing. *Exhibit B, p.6:18-21*.

As a treater, Dr. Rasmussen has not seen Plaintiff since January 10, 2020. *Exhibit B, p.23:4-6, p.23:12-14*. As an expert, Dr. Rasmussen saw Plaintiff on February 22, 2021. *Exhibit C, p.12:23-p.13:3*. As an expert, she reviewed Dr. Anderson's notes and his deposition testimony. *Exhibit C, p.13:4-12; Exhibit D, Rasmussen's report, p.3*. She performed additional testing on Plaintiff, which "indicate the absence of current psychopathology." *Exhibit D, p.5*. According to Dr. Rasmussen's March 8, 2021 report, Plaintiff "is not currently demonstrating clinically significant symptoms to suggest diagnosis of a mental health condition, including PTSD." *Exhibit D, p.5*.

Dr. Rasmussen testified that on February 22, 2021, from a mental health standpoint, Plaintiff was asymptomatic. *Exhibit C, p.19:16-p.20:5*. He did not have any symptoms of PTSD. *Exhibit C, p.20:19-p.21:5, p.22:1-14*. This was based on **a PCL-5 survey** of the DSM-5 criteria for PTSD. *Exhibit C, p.21:6-11*.

In sum, of the three times she saw Plaintiff, Dr. Rasmussen only diagnosed PTSD once – the one time when she did not perform any testing on Plaintiff, such as the MMPI or the PCL-5 survey. Dr. Rasmussen's expert report opines that Plaintiff had "a delayed onset PTSD" in January of 2020, and his symptoms were well-controlled after eight subsequent therapy sessions with Dr. Anderson. *Exhibit D, p.5*. She testified that the January 2020 diagnosis of PTSD was based only on Plaintiff's self-report of symptoms and his reaction to discussing his symptoms. *Exhibit C, p.33:2-7.*

**B. METHODOLOGY**

Dr. Rasmussen testified, as an expert, that **written testing and confirmation** of a PTSD diagnosis is preferred, and admitted that **Plaintiff never showed PTSD symptoms in written, objective testing**. *Exhibit C, p.27:2-8*. Dr. Rasmussen testified as to the proper methodology for diagnosing PTSD:

> So we normally would do an **objective** measure to complement the subjective symptoms, but typically what you do first is you just get a history of the sense and how they're progressing and how -- or how they're presenting. And then I like to do some form of **assessment** so I understand, you know, how it matches with the normative base. I will be honest with you that we are lacking in our field on assessment for posttraumatic stress disorder. I actually do not use the DAPS anymore, which is what I used in Mr. Wagnon's case, because the validity measures are so terrible. They're really insensitive to malingering PTSD because they're ridiculous questions. So I have since switched to the **PCL-5**, which is a self-report, but it does not have validity indicators in it. It just goes off of the DSM-5 criteria.

*Exhibit B, p.15:22-p.16:18*. The validity indicators are to determine if someone is faking PTSD. *Exhibit B, p.16:24-p.17:4*. As for the DSM-5, "[t]hat is the criteria we follow for diagnosis of PTSD. I reference that based on the symptoms I glean from the **interview and the testing results**. And the PCL-5 that I use now goes strictly off of the DSM-5 criteria." *Exhibit B, p.17:8-21*. She testified that she does formal testing to verify symptoms and also to determine if someone is a credible reporter. *Exhibit B, p.33:3-4*.

In sum, Dr. Rasmussen testified that a proper methodology to diagnose PTSD requires an interview and testing results.

**LAW AND ARGUMENT**

This Motion calls on the Court to exercise its "mandatory role as a gatekeeper." *Mukhtar v. California State Univ., Hayward*, 319 F.3d 1073, 1074 (9th Cir. 2002). In the seminal case of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court

held that the Federal Rules of Evidence, especially Rules 104(a) and 702, place limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony rests on a reliable scientific foundation. *Id*. at 589. On remand of *Daubert ("Daubert II")*, the Ninth Circuit recognized that "something doesn't become 'scientific knowledge' just because it's uttered by a scientist …." *Daubert II*, 43 F.3d 1311, 1315–16 (9th Cir. 1995). The Seventh Circuit has likewise stated "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999).

When, as here, a party challenges the admissibility of proffered expert opinions, the trial court must initially determine, pursuant to Rule 104(a),[1] whether the expert's testimony is scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592. If so, the court must then consider whether the proffered testimony meets the reliability and relevancy tests of Rule 702. Specifically, Rule 702 permits expert testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The proponent of the proffered expert testimony bears the burden of establishing its admissibility by a preponderance of proof. *Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v*

[1] FRE 104(a) provides in relevant part: "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court ..."

*United States*, 483 U.S. 171, 175–76, 107 S. Ct. 2775 (1987)); Fed.R.Evid. 702 Advisory Committee Notes.

Rule 702 has two prongs: reliability and relevance. First, the evidence must be reliable, or in other words, trustworthy. *Daubert*, 509 U.S. at 590 n.9. Trustworthiness guarantees that scientific methods and procedures support the information. *Id.* at 590. Second, the evidence must be relevant. *Id.* at 591, 113 S. Ct. at 2795–96. Courts have described the relevance criterion as one of "fit." *Id.* To satisfy this requirement, proffered testimony or evidence must relate to the facts of the case such that it will help the jury resolve a factual dispute. *Id.* "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

The United States Supreme Court has clarified that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* [bare authority] of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v Joiner,* 522 U.S. 136, 118 S. Ct. 512, 519 (1997); *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 (8th Cir. 1999). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exch. Nat '1 Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (emphasis added).

Again, "[t]he proponent of expert testimony has the burden of demonstrating that the proffered opinion is worthy of admission into evidence." *Bernardoni v. Industrial Com'n*, 362 Ill.App.3d 582, 595, 840 N.E.2d 300, 310-11 (3rd Dist. 2005). Plaintiff cannot meet that burden here. Dr. Rasmussen has not provided the necessary factual or scientific foundations for his PTSD diagnosis.

### A. RELIABILITY - DR. RASMUSSEN HAS NOT APPLIED THE FACTS IN A RELIABLE SCIENTIFIC METHODOLOGY.

Reliability focuses on whether the underlying methodology is scientifically valid. *Clark v. Takata Corp.*, 192 F.3d 750, 756-57 (7th Cir. 1999). "An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3rd Cir. 2000). An expert's opinion must be reasoned and founded on data using the **methods of the relevant discipline** in order to arrive at the opinion. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

Rule 702 requires that expert testimony is "the product of reliable principles and methods" and that the expert has "applied the principles and methods reliably to the facts of the case." The requirements of Rule 702 "make certain that an expert, whether basing the testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Where the flaws in an expert's technique "are large enough that the expert lacks 'good grounds' for his or her conclusion, the court should exercise its gatekeeper role and exclude the evidence." *Heller v. Shaw Industries, Inc.*, 1997 WL 535163, 7 (E.D.Pa. 1997). Instead, to be admissible, a medical expert's ultimate opinion must be grounded in the scientific process and may not be merely a subjective belief or unsupported conjecture. *See Daubert*, 509 U.S. at 589–90, 113 S.Ct. 2786; *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 608–09 (7th Cir. 2000).

*Daubert* provided five guidelines to assist the trial judge in assessing the reliability of the expert's testimony:

1. Whether the expert's theory can be and has been tested;
2. Whether the theory has been subjected to peer review and publication;
3. The known and potential rate of error of the technique or theory when applied;

4. The existence and maintenance of standards and controls; and
5. The degree to which the technique or theory has been generally accepted in the scientific community.

*Daubert*, 509 U.S. at 489-495.

As shown above, Dr. Rasmussen testified to the technique that has been generally accepted in her scientific community to make a PTSD diagnosis – which includes objective testing, which can be either through the MMPI written test or the PCL-5 survey. However, Dr. Rasmussen openly admitted that she did not administer either of these tests to Plaintiff on January 10, 2020 when she made her **only** PTSD diagnosis. Instead, she relied on Plaintiff's own self-report. This flies in the face of her own testimony as to the proper methodology. This is not sufficient to support an admissible diagnosis.

Also, the methodology used by TZPR's expert, Dr. Daniel, included a psychiatric interview, mental status examination, psychological testing including the MMPI-2, and the Forensic Questionnaire used by Dr. Daniel, which is further evidence that objective testing is the accepted methodology in the field. *Exhibit E, p.1*. Consistent with the other testing in this case, Dr. Daniel opined that Plaintiff does not have PTSD. *Exhibit E, p.5, 7*.

The Northern District has likewise required more than a self-report as a proper foundation for a PTSD diagnosis. In *Jones v. Standard Ins. Co.*, No. 12 C 328, 2013 WL 5549779 (N.D. Ill. Oct. 8, 2013), a PTSD diagnosis was properly admitted where the expert was "a well-qualified psychologist, experienced in diagnosing and treating patients suffering from PTSD, and has administered a recognized psychological test, the MMPI–2. The *Daubert* standards to not preclude his testimony." *Id*. at *3.

Because Dr. Rasmussen did not use the methodology she, herself, testified was the proper method for reaching a diagnosis, her testimony should be barred.

### B. RELEVANCE – DR. RASMUSSEN'S DIAGNOSIS IS NOT BASED ON A SUFFICIENT FACTUAL FOUNDATION.

Rule 702 requires that expert testimony be "based upon sufficient facts or data." Rule 703 further requires that the expert rely on facts "of a type reasonably relied upon by experts in the particular field…" The Court must make an independent evaluation of proffered expert testimony to ascertain whether it conforms to these requirements. *Heller v. Shaw Industries, Inc.*, 1997 WL 535163, 8 (E.D.Pa. 1997).

As discussed in detail above, Dr. Rasmussen did not rely on any testing or the methodology she touted as the proper method for reaching a diagnosis. Instead, she relied on Plaintiff's own self-reports. The Seventh Circuit has affirmed the exclusion of a PTSD diagnosis on similar facts:

> [Dr.] Kohn, who did not examine Lewis and Livingston until two-and-a-half years after the incident, conceded that Livingston did not have PTSD at the time of his evaluation, but stated that she "likely met criteria for [PTSD] at some point in the months following the accident." Kohn **reached this conclusion based only on information gathered from Livingston herself; he did not examine her prior medical records**. Additionally, Kohn diagnosed Livingston with an underlying mood disorder, which he opined was likely Bipolar Type II, yet he failed to support his conclusions related to the interplay of this underlying disorder and Livingston's past bout with PTSD. As to Lewis, Kohn found that the incident "triggered" his headaches. There again, however, he failed to consider and discount other potential causes, including many purported stressors that were occurring in Lewis's work and social lives.

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 706 (7th Cir. 2009). Dr. Rasmussen's diagnosis suffers from the same fatal flaws and must be barred.

WHEREFORE, for the foregoing reasons, Defendant Tazewell & Peoria Railroad, Inc. respectfully requests that this Court enter an order barring the PTSD diagnosis of Dr. Rasmussen, and granting such further relief as the Court deems appropriate.

Respectfully submitted,

THOMPSON COBURN LLP

By s/ Kurt E. Reitz
Kurt E. Reitz, #06187793
525 West Main Street, Suite 300
Belleville, Illinois 62220
618-277-4700
FAX 618-236-3434
kreitz@thompsoncoburn.com

*Attorney for Defendant Tazewell & Peoria Railroad, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ Kurt E. Reitz