E-FILED
Friday, 13 August, 2021 10:19:12 AM
Clerk, U.S. District Court, ILCD

# Deposition of:
# Dr. Lauren Rasmussen

**Date:** January 15, 2021

**Case:** Charles Wade Wagnon v. Peoria and Pekin Union Railway and Tazewell & Peoria Railroad, Inc.

**Reporter:** Doris Eby, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

CHARLES WADE WAGNON, )
Plaintiff, )
-vs- ) No: 1:20-CV-01208-JEM-JEH
PEORIA AND PEKIN UNION RAILWAY, AND TAZEWELL & PEORIA RAILROAD, INC., )
Defendants. )

DISCOVERY DEPOSITION VIA VIDEO CONFERENCE OF
DR. LAUREN RASMUSSEN
TAKEN ON BEHALF OF THE DEFENDANTS
ON JANUARY 15TH, 2021

Reported by
Doris A. Eby
Missouri CCR Number 518
Illinois CSR Number 084-004140

KEEFE REPORTING COMPANY
11 North 44th St.
Belleville, IL 62226
(618)277-0190



I N D E X O F E X A M I N A T I O N


WITNESS: DR. LAUREN RASMUSSEN

| | |
|---|---|
| Direct Examination by Mr. Reitz | 5 |
| Cross-Examination by Mr. Sterbcow | 27 |
| Redirect Examination by Mr. Reitz | 31 |


I N D E X O F E X H I B I T S


DR. LAUREN RASMUSSEN

| | |
|---|---|
| Defendant's Ex 1 Curriculum Vitae | 30 |
| Defendant's Ex 2 Jefferson Neurobehavioral Group | 6 |
| Defendant's Ex 3 Expert Witness Experience | 5 |




IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

CHARLES WADE WAGNON, )
Plaintiff, )
-vs- ) No: 1:20-CV-01208-JEM-JEH
PEORIA AND PEKIN UNION RAILWAY, AND TAZEWELL & PEORIA RAILROAD, INC., )
Defendants. )

DEPOSITION OF DR. LAUREN RASMUSSEN, taken to be used in an action pending in the United States District Court, Central District of Illinois, State of Illinois, pursuant to agreement between counsel, under the provisions of Rule 26(a) of the Rules of Civil Procedure, taken on the 2nd day of January 15th, 2021, between the hours of eight o'clock in the forenoon and six o'clock in the afternoon of that day; all parties appearing remotely by video conference; before Doris A. Eby, CCR, CSR, MO & IL., in a certain cause now pending in the United States District Court, Central District of Illinois, wherein Charles Wade Wagnon is Plaintiff and Peoria and Pekin Union Railway and Tazewell & Peoria Railroad, Inc., are Defendants; on behalf of the Defendants.

-o0o-



A P P E A R A N C E S

FOR THE PLAINTIFF (Via Video Conference)
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
By: Paul M. Sterbcow, Esq.

FOR THE DEFENDANTS (Via Video Conference)
THOMPSON COBURN
525 West Main St., Suite 300
Belleville, IL 62220
By: Kurt E. Reitz, Esq.

Videographer: Mudge Legal Video, Rich Donner

DIRECT EXAMINATION
QUESTIONS BY MR. REITZ:
(Going on the record at 8:03 a.m.)
(The Court Reporter marked Defendant's Ex 3.)
**Q Dr. Rasmussen, my name's Kurt Reitz and we met briefly before this deposition. I represent Tazewell Peoria Railroad in this case that's been filed up in Springfield, Illinois. And I'm here to take your deposition today. If -- sometimes I mumble. Sometimes I will say things that don't make sense. If I do, just tell me and we'll get it figured out between us.**
**All right?**
A All right.
**Q All right. Can you tell the court reporter your name?**
A Lauren Woodruff Rasmussen.
**Q And we're obviously here to take your deposition with regards to Charles Wagnon and the two visits you had with him.**
**First let me ask you, do you have any kind of independent recollection of Mr. Wagnon?**
A I do.
**Q Okay. And as it relates to this case,**



**were you provided with medical records from any other source other than your own records?**
A No, sir. The first time I saw him when he was sent by workman's comp, he hadn't had any medical records at that point. And I have not received any since.
**Q Okay. And it's my understanding from the deposing Mr. Wagnon that he got no medical treatment for any kind of physical injury from this accident.**
**Is that your understanding also?**
A That's my understanding, yes.
**Q And have you looked at any kind of depositions in this case at all?**
A No, sir, I have not reviewed any records in this case.
**Q Okay. So you anticipated my next question, no depositions, no records.**
**Have you looked at anything else from any other source other than your own records and testing in this case?**
A No, sir.
**Q Thank you.**
**(The Attorney marked Defendant's Ex 2.)**
**The records that we have -- we've marked**



**as Exhibit 2, which was the chart that you had sent both Mr. Wagnon's attorneys and me, and as I understand, it includes these two visits, notes of some phone calls, and then some of the underlying testing?**
A Yes, sir.
**Q Okay. And then it talks about raw test materials in the materials that we have.**
**Are there separate raw test materials?**
A Yes, sir.
**Q And do you still have those?**
A Yes, sir.
**Q And are those considered confidential or how does that work, I'm just asking?**
A Sure. They're protected documents and so we release them to experts who are qualified to review them.
If you would like the records, you're entitled to them. I'll just -- all of the protected information will be redacted, which essentially actually renders them fairly useless for your purposes. So we don't charge you the copy since they're not helpful since we redact everything.
**Q And if they're released to other experts,**



**are they redacted also?**
A No, sir, not if it's an expert who is qualified to interpret them.
**Q Okay. Mr. Wagnon was referred to you by his employer, Kirby, as I understand it; correct?**
A Yes, sir.
**Q And in particular, a woman by the name of Kim Cohen.**
**Do you know her?**
A I've just spoken with her a couple of times.
**Q And what were you asked to do, as you understood it?**
A I was just asked to evaluate him and give a diagnostic impression and treatment recommendations following his workplace accident.
**Q Okay. And at least from, from your notes, as I see it, Kim Cohen indicated there were no injuries resulting from this event, no physical injuries?**
A That was my understanding at the time.
**Q Okay. And as it relates to Mr. Wagnon, you saw him, as I'm looking at this, for the first time on February 4th, 2019; is that right?**

Page 9

A Let me just find my note.
Yes, that is correct.
**Q And Doctor, you would have performed what I understand to be a psychological evaluation on that date?**
A Yes, sir.
**Q Any kind of physical exam at all?**
A No, sir.
**Q All right. And as it relates to the exam you had with him, when you -- when he presented on February 4th, 2019, he was dressed appropriately for the occasion?**
A Yes, sir.
**Q He walked in, he could ambulate without difficulty?**
A Yes, sir.
**Q His mood was normal?**
A It was euphonic, yes, sir.
**Q And you said "euphonic." In plain English or simple terms, with does that mean?**
A That there was no mood disturbance. He was generally happy.
**Q Okay. And his -- you had also have down that rapport was easily established and maintained?**

Page 10

A Yes, sir.
**Q And, again, in plain English, that means you could talk to him, engage in conversation with him, there was a back and forth?**
A Well, and we seemed to have an amicable relationship. There was no hostility there. He seemed open and comfortable with me.
**Q Thank you.**
**His eye contact was good?**
A Yes, sir.
**Q Thought process was normal?**
A Yes, sir.
**Q Speech level was normal?**
A Yes, sir.
**Q Reading level was appropriate?**
A Yes, sir.
**Q He was compliant with the interview and assessment?**
A Yes, sir.
**Q And there was no indication he had any desire to hurt himself or others; is that fair?**
A That's correct.
**Q All right. And those things I just went through, those are all obviously good things; correct?**

Page 11

A That's correct.
**Q Okay. And as it relates to him, you took a prior history of him as it related to any kind of mental health issues, as I understand it?**
A Yes, sir.
**Q Okay. And you had down that he had been shot at while 9 or 10 years old while hunting and had some emotional abuse during his childhood; correct?**
A That's correct.
**Q All right. But no -- no other history of any kind of mental health treatment before you saw him; correct?**
A That's correct.
**Q Okay. You did testing of him, as I understand it?**
A Yes, sir.
**Q And I'm just going to rattle them off to make sure I got them there. I'll follow up with some questions about it.**
**There was an Alertness Questionnaire; correct?**
A Yes, sir.

Page 12

**Q And a Minnesota Multiphasic Personality Inventory test; correct?**
A Yes, sir.
**Q And that's -- often that's called an MMPI or MMI?**
A MMPI, that's correct.
**Q Okay. And then an NAB Orientation?**
A Yes.
**Q Okay. A memory test and a Wide Range Achievement Test; correct?**
A And you missed the Detailed Assessment of Posttraumatic Stress.
**Q Yes. Yeah. For some reason that's my last one.**
**And then the last one was the Detail Assessment of Posttraumatic Stress, or a DAT test; correct?**
A Yes, sir.
**Q Okay. And how long would it have taken him to take all of those tests?**
A I can actually answer that question for you.
**Q Okay.**
A He tested for 2.75 hours.

Page 13

**Q Okay. And those tests are considered to be a fairly standard battery of tests you would do when you're doing a psychological assessment?**
A Yes, sir.
**Q Okay. And the MMI in particular, what is -- MMPI in particular, what is that for?**
A It is a broad-band screen of emotional functioning and personality characteristics. It looks at a bunch of different kinds of psychopathology -- the reason why I like it is because it also has a lot of embedded validity indicators to let me know if somebody is expressing themselves in an open and honest manner.
**Q Okay. And in his situation -- so it's a personality test essentially; correct?**
A Personality and emotional functioning.
**Q Okay. So on his MMPI, his testing was entirely within normal limits, as I understand it; correct?**
A Yes.
**Q Okay. And on the -- that testing, as I understand, and I'm just looking at one of your notes, it says he is not suffering from clinical levels of posttraumatic avoidance.**

Page 14

A Where are you seeing that? Is that on my report?
**Q Yeah. It was under the Avoidance section of the testing where you went through it. It says "The respondent's overall AV score indicates he is not suffering from clinical levels of posttraumatic avoidance."**
**And then you go on to say, "In light of this finding, the two subscales are not interpreted," and you actually skipped part of the test from here.**
A Okay.
**Q Looks like -- looks like it's at -- well, I can't help you with that because we Bates numbered the documents and you don't have the Bates notes, so...**
A Okay. Because I'm looking down there where I describe his findings on the test under the Social Emotional functioning part, which is the bottom of Page 5 of my evaluation, and what I have written is his profile indicated re-experiencing symptoms and some degree of peritraumatic distress, which is fear, helplessness, terror, thoughts that he could have died, upset, etcetera.

Page 15

**Q Okay. In any event, to kind of go to the end on this, based on your psychological evaluation, did he meet the criteria for diagnosing post-traumatic stress syndrome at that time?**
A He did not.
**Q Okay. And why is that, Doctor?**
A Because after a interview and assessment, he did not satisfy all of the criteria needed. He needs a certain amount of symptoms and he didn't have it. He wasn't asymptomatic, but it wasn't at the threshold consistent with post-traumatic stress disorder.
**Q So you concluded, as I understand, again, looking at your report, it says, "Mr. Wagnon does not meet the criteria for post-traumatic stress syndrome, PTSD," correct?**
A Correct.
**Q Okay. And you did find that he fell into an adjustment -- category for adjustment disorder and anxiety; correct?**
A That's correct.
**Q Okay. In order to -- in your practice, in order to diagnose someone with PTSD, what would you need -- what tests would you need to do?**

Page 16

A So we normally would do an objective measure to complement the subjective symptoms, but typically what you do first is you just get a history of the sense and how they're progressing and how -- or how they're presenting. And then I like to do some form of assessment so I understand, you know, how it matches with the normative base.
I will be honest with you that we are lacking in our field on assessment for posttraumatic stress disorder. I actually do not use the DAPS anymore, which is what I used in Mr. Wagnon's case, because the validity measures are so terrible. They're really insensitive to malingering PTSD because they're ridiculous questions.
So I have since switched to the PCL-5, which is a self-report, but it does not have validity indicators in it. It just goes off of the DSM-5 criteria.
**Q Okay. So if I understood what you just said, at a very high level, and I'm gonna to try to make it so I can understand it and maybe somebody can understand it later, you changed the test you done; correct?**
A I do not -- right, I do not do the DAPS

Page 17

anymore, because if somebody's faking PTSD, you're supposed to be able to catch it with validity indicators. The validity indicators on that test are poor, so I stopped using it.
**Q Okay. And the test you use now is called what?**
A PCL-5.
**Q All right. And then just from looking at this on my own, there are -- some people use what's referred to as a DCM-4, DCM-5 to diagnose patients?**
A The DCM -- yes. Yes.
**Q I'm sorry, I said D. I said C. I apologize.**
**You said DSM-4, DSM-5 to diagnose patients?**
A We're on the DSM-5, that's correct. That is the criteria we follow for diagnosis of PTSD. I reference that based on the symptoms I glean from the interview and the testing results. And the PCL-5 that I use now goes strictly off of the DSM-5 criteria.
**Q Okay. And back then when you saw Mr. Wagnon, was the DCM -- DSM-5 criteria used?**
A Yes, sir.

Page 18

**Q Okay. And he did not meet that for PTSD; is that correct?**
A That's correct.
**Q Okay. You believe that he was not disabled and could return to work as a result of that visit; correct?**
A That's correct, but I did recommend a slow progression back into the workforce.
**Q Yeah. And I was going to ask you about that. In fact, you specifically recommended a slow progression back into the workforce to improve his chances for success, obviously; correct?**
A That's correct.
**Q Okay. And you would have passed that on to his employer?**
A Yes, sir, that's correct.
**Q And had you worked with Kirby before in other -- with other patients, other employees?**
A I believe this is the first Kirby employee I had ever seen.
**Q Okay. Is it your understanding that Kirby, in fact, worked with him for this slow progression into the workforce?**
A It was my understanding that that was the

Page 19

plan.
**Q Okay. All right.**
A Not follow up to determine -- I'm sorry, I interrupted you.
**Q No, no, no, I think it might be exactly reverse. Did you have something else you wanted to say?**
A Yes, sir. I did not have follow-up communication with Kirby after I submitted my findings until, you know, 11 months later at the follow-up.
**Q Okay. All right.**
**After this February 4th visit, as I understand, you talked briefly with Mr. Wagnon and his wife by phone the next day?**
A Yes, sir.
**Q And told him that it was your recommendation that he could return to work, that he was not disabled?**
A Yes.
**Q And then followed up with him with another phone call the following week. And, in fact, he was improving, as I understand it?**
A Yes, sir.

Page 20

**Q Did you ever prescribe any kind of medical care for him at all --**
A How so?
**Q -- as a result of that visit? Referral to a psychiatrist doctor, a medical doctor, anything like that?**
A No, sir.
**Q And did you ever prescribe any kind of prescription medicine for him at all, or --**
A No, sir, I'm not a --
**Q -- or refer him to --**
A I'm sorry, I'm not a prescribing psychologist.
**Q Okay. And then the next time you saw him then after February 4th, 2019, was on January 10th, 2020, almost a year later?**
A Yes, sir.
**Q And it's your understanding he had been working -- he went back to work and had been working at least up through December 18th, 2019; correct?**
A That's correct.
**Q All right. And then when you saw him on January 10th, 2020, Dr. Rasmussen, did you perform anymore written testing of Mr. Wagnon, such as you**

Page 21

**did on the first visit?**
A I did not. He was very distressed at that point. He looked so drastically different than the first time I had seen him, and I had already determined that he was a -- of a reliable reporter. So I didn't feel that I needed to give a checklist of DSM symptoms. I just ran through them in my mind while I was assessing his reported symptoms.
**Q And then as a result of that visit, you suggested that he get some what I understand to be counseling, eight to 12 60-minute counseling sessions; is that correct?**
A That's correct.
**Q And the point of that was to have him address his anxiety and hopefully return to work as a tugboat captain?**
A Yes, sir.
**Q Okay. And because of where you're located and because of where he was located, you suggested he see someone closer to him, to where he lived?**
A That's correct.
**Q And as I understand, you found a psychologist for him in the Arkansas area, Brian Anderson?**

Page 22

A That's correct.
**Q And is it your understanding then that Mr. Wagnon followed up with Brian Anderson?**
A It is my understanding that he followed up with Dr. Anderson.
**Q And Dr. Rasmussen, did you ever get any kind of records or report from Dr. Anderson as to how things went on those counseling sessions?**
A No, sir.
**Q Okay. Was it -- the reason for your suggestion that he get counseling sessions, again, was to deal with his anxiety and hopefully get him back to work; correct?**
A That's correct.
**Q And you believed that these eight to 12 sessions would be helpful obviously; correct?**
A That's correct.
**Q And your goal was to get him back to work with this therapy by Dr. Anderson; correct?**
A That's correct.
**Q And that's a prescribed course of treatment, when somebody has anxiety over returning to work after an accident, to have counseling about it, address it, and then go back to work; correct?**

Page 23

A If possible. That's the goal. It doesn't always happen that way.
**Q Understood.**
**And have you seen Mr. Wagnon since January 10th, 2020?**
A I have not.
**Q Have -- do you have any information as to how he is doing at present?**
A I spoke briefly with his counsel and I understand that he has returned to some form of employment, but it is not as a tugboat captain.
**Q Okay. So the last visit you had with him was on January 10th, 2020; correct?**
A That's correct.
**Q So as I understand, other than phone calls, you had two visits with him, one on February 4th, 2019, and another on January 10th, 2020?**
A That's correct.
**Q Okay. And the only day any kind of testing was done was on that first visit of February 4th, 2019?**
A That's correct.
**Q And you have no firsthand information,**

Page 24

**either from Mr. Wagnon or a psychologist, as to his condition at the present time?**
A That's correct.
**Q And do you have any opinions as to his current condition or his ability to work?**
A Not unless I see him and reassess him.
**Q Have you ever told Mr. Wagnon that he should not return to work as a tugboat captain?**
A At the time I saw him on January 10th, I didn't believe, with his current symptomology, that he was safe to be a tugboat captain at that time. But if the -- if the anticipated question is if I told him that he should never return, the answer to that is no.
**Q Okay. And because at the time you saw him on January 10th, that's why, obviously, you recommended the counseling, to try and get him back to work; correct?**
A That's correct.
**Q Okay. If Mr. Wagnon in his last three sessions with Brian Anderson, and I understand you don't have the records, but just assume this for me, if you would, if he had no anxiety symptoms, the PTSD symptoms or anxiety symptoms had been resolved,**

Page 25

**that would be a good thing?**
A Yes, sir.
**Q And that would be an indicator that he could, at least, try to go back to work?**
A That's a very hard thing for me to determine with one little snippet of a therapy there
**Q No, understood. Understood.**
A But typically if I would see a reduction in symptoms, I would recommend attempting to try to return to work, because that's actually sort of the final resolution of your symptoms is getting back on the horse, if you will.
**Q Okay. And to follow up on that, this whole issue with avoidance, as I understand it very generally, and I'm grossly oversimplifying, but with avoidance issues like this, the idea is to face them, deal with them, and move on?**
A Right. Avoidance maintains the anxiety. So continuing to avoid things that make you anxious continues to perpetuate the anxiety.
**Q So in the real world, if there's some issue with returning to work, actually not returning to work could increase the anxiety?**
A Or it could maintain it, not necessarily

Page 26

increase, but maintain for a specific kind of task.
**Q Dr. Rasmussen, do you have any kind of specific training or specialty in the diagnosis of PTSD?**
A As a clinical psychologist, I had a lot of training in all psychological disorders, but I did my clinical competency exam in graduate school on a trauma case.
So yes, sir. I do have specific training in PTSD.
**Q And is that something you see in your practice on occasion?**
A Regularly.
**Q Regularly? Okay.**
**And the idea is, for treatment of that when you do see it, is typically counseling, and dealing with the issues, and returning to the work environment?**
A Again, that's the goal.
**Q Sure.**
A Sometimes people, especially if they're in jobs that are dangerous and can put other people at risk, you know, that's a course of action we have to tread very lightly. And not a lot of jobs will

Page 27

allow for a graduated return to work. But -- but yes, that's generally the goal is to resolve the symptoms and get the person back to their premorbid level of functioning, which would include return to driving, return to work, whatever it is where the trauma occurred.
**Q And I understand you don't have the records from Dr. Brian Anderson.**
**Did you ever talk to him about how Mr. Wagnon was doing?**
A I did not.
**Q Okay. All right.**
**So the last information you have, at least directly from Mr. Wagnon, would be as of your visit on January 10th, 2020?**
A That's correct. Well, actually, January 14th, 2020, when I spoke with him over the phone.
**Q By way of follow-up on the January 10th visit?**
A Yes, sir.
MR. REITZ: Okay. I don't believe I have any other questions. Thank you.
CROSS-EXAMINATION

Page 28

QUESTIONS BY MR. STERBCOW:
**Q Good morning, Dr. Rasmussen. Paul Sterbcow. I've just got a few. I won't keep you long. I just want to confirm some things for this record.**
**As of February 5th, 2019, was it your expert opinion that Mr. Wagnon was suffering from adjustment disorder with anxiety?**
A Yes, sir.
**Q Was it your opinion that this condition was caused by the January vessel-bridge accident that he had described to you?**
A Yes, sir.
**Q As of January 14, 2020, was it your expert opinion that Mr. Wagnon was suffering from posttraumatic stress disorder?**
A Yes, sir.
**Q Had his kind of progressed to posttraumatic stress disorder between February 19 and January --**
**(Reporter clarification.)**
**Okay. Is it your expert opinion, Doctor, that Mr. Wagnon's adjustment disorder with anxiety had progressed to posttraumatic stress disorder in**

Page 29

**the intervening time between you saw him in February of '19 and January of '20?**
A Yes, sir.
**Q Was this condition then, the posttraumatic stress disorder, also caused by the January 19 vessel-bridge accident that he described?**
A Yes, sir.
**Q Did you ever find any evidence, in your clinical evaluation of Mr. Wagnon, that he was faking or malingering any condition?**
A No, sir. He was one of the most credible patients I think I can ever remember having seen.
**Q So based on your expertise and your clinical contact with Mr. Wagnon, are you confident that all of the findings and conclusions in your report and that you've testified here to today are accurate?**
A Yes, sir.
**Q Hypothetically, if Mr. Wagnon, after participating in the treatment with Dr. Anderson, chose to leave the maritime industry for employment that does not cause him psychological stress, as a clinical psychologist, do you have any criticism of his decision?**

Page 30

A I think you have to do what makes you feel comfortable and what makes you feel safer. Certainly, as I mentioned before, a final resolution of posttraumatic stress disorder means going back to the thing that caused you anxiety and overcoming it.
He's a tugboat captain. I do a lot of maritime work. I'm aware of how dangerous of a job that is. If he does not feel safe to carry out his responsibilities because of his prolonged anxiety or his anxiety in that specific situation, then I find that he would have made a good decision not to return to that form of work.
**Q Okay. And did you -- you've reported all of your findings and conclusions to his employer, Kirby, throughout the process?**
A Yes, sir.
**Q Is that correct?**
A Yes, sir.
(The Attorney marked Defendant's Ex 1.)
**Q Okay. And then one more question. Based on your CV and the testimony log that you provided, is it fair to say that the majority, looks like 80 percent or so, of your activity, in terms of forensic clinical psychology, is performed on behalf**

Page 31

**of defendants in lawsuits?**
A That's correct, I'm mostly retained by the defense.
**Q Okay. Do you feel any need, at this point, to have to see Mr. Wagnon again or is that necessary?**
A I do not, unless somebody wants to deem me an expert in this case and call me to testify, then I do not need to see him or review additional records.
MR. STERBCOW: Okay. That's all I have. Thank you very much. I appreciate your time.

REDIRECT EXAMINATION

QUESTIONS BY MR. REITZ:
**Q Doctor, a few questions by way of follow-up.**
A Sure.
**Q When you -- when you saw him on January 10th, as I understand, that's when, for lack of a better word, you converted your diagnosis from one of anxiety to posttraumatic stress disorder; is that correct?**
A That's correct.
**Q All right. And on January 10th, did you**

Page 32

**do any kind of written testing of him at that time?**
A I did not.
**Q Okay. You based that change in diagnosis on your interview with him; correct?**
A That's correct. I assessed all of the symptoms of PTSD per DSM-5 criteria with him.
**Q And, in fact, the only written testing that you have indicates he does not meet the criteria for PTSD; correct?**
A Approximately a year prior, yes, sir.
**Q Okay. All right.**
**And as I understand from the questions that you were asked by counsel for Mr. Wagnon, if you were going to testify as an expert in this case, you would want to see Mr. Wagnon again?**
A That would be helpful. And I would also need to review all of his records from his treatment with Dr. Anderson and anything else that he's done over the course of the last year.
**Q You would agree with me that a formal diagnosis of PTSD typically requires written testing to support that conclusion?**
A Actually, I think most people do not do formal testing. In fact, most people who I see

treating PTSD cannot do formal testing, such as social workers, LPCs, Master's degree clinicians.

I do formal testing to verify symptoms and to determine if someone is a credible reporter.

Mr. Wagnon was a credible reporter, I don't question that. So I was able to see, just physically sitting with him, a drastic change in functioning. I did not feel a need to put him through testing again.

**Q I understand that. I think what I was asking is, at a level of a trained psychologist or psychiatrist, typically testing would be required to make that diagnosis?**

A And what I'm telling you is it's not actually required. It's preferred, but a lot of people do not do testing prior to making a psychological diagnosis. They do it based on an interview where they review symptoms and --

**Q Understood. So you're saying it's preferred?**

A Yes, sir, but not required.

MR. REITZ: Okay. All right. Thank you. That's all I have.

MR. STERBCOW: Thanks everyone.



THE WITNESS: I'll waive.

COURT REPORTER: Okay. And I need to get everybody's orders, starting with you, Kurt.

MR. REITZ: Whatever we normally get, Doris.

MR. STERBCOW: I guess, me too. Well, you don't know what I normally get, do you?

THE WITNESS: You can order the same thing as Kurt.

MR. STERBCOW: Right. Yeah, exactly, whatever Kurt gets, I get. That's fine, thank you, that's good.

(Going off the record at 8:34 a.m.)



C E R T I F I C A T E

I, Doris A. Eby, CCR, CSR, within and for the State of Missouri, CSR, within and for the State of Illinois, hereby certify that, pursuant to notice, on the 15th day of January, 2021, all parties appearing remotely by video conference;

DR. LAUREN RASMUSSEN,

came before me, who was by me first duly sworn on her oath to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon carefully examined upon her oath, and her examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 26th day of January, 2021.

____________________________

Doris A. Eby, CCR, CSR (MO, IL)
Missouri License No. 518
Illinois License No. 084-004140