E-FILED
Friday, 13 August, 2021 10:19:13 AM
Clerk, U.S. District Court, ILCD

# Deposition of:
# **Dr. Lauren Rasmussen**

**Date:** May 4, 2021

**Case:** Charles Wade Wagnon v. Peoria and Pekin Union Railway, et al.

**Reporter:** Beverly S. Hopkins, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

CHARLES WADE WAGNON, )
)
Plaintiff, )
)
vs. ) No. 1:20-CV-01208-JEM-JEH
)
PEORIA AND PEKIN UNION )
RAILWAY, and TAZEWELL & )
PEORIA RAILROAD, INC., )
)
Defendants. )

ZOOM DEPOSITION OF DR. LAUREN RASMUSSEN
Taken May 4, 2021

Reporter: Beverly S. Hopkins, RPR

IL CSR No. 084-004316, MO C.C.R. No. 968

APPEARANCES
(All parties appearing via Zoom)

For Plaintiff:
By Beth E. Abramson
Lewis, Kullman, Sterbcow & Abramson, LLC
601 Poydras Street
Suite 2615
New Orleans, LA 70130

For Defendants:
By Kurt E. Reitz, Esq.
Thompson Coburn, LLP
525 West Main Street
Suite 300
Belleville, IL 62222

Also present to moderate videoconference:
Rich Donner, Mudge Legal Video

INTERROGATION INDEX


| | Page |
|---|---|
| Direct Examination by Mr. Reitz | 4 |
| Cross-Examination by Ms. Abramson | 31 |
| Redirect Examination by Mr. Reitz | 36 |


EXHIBITS


| Defendants' | | |
|---|---|---|
| 1 | Notice of Deposition, Exhibit A, Documents to be produced by Dr. Rasmussen | 4 |
| 2 | Professional Services Agreement | 6 |
| 3 | Fee Schedule | 7 |
| 4 | Testing and March 8, 2021, report | 4 |
| 5 | Expert Witness Experience list | 4 |
| 6 | March 8, 2021, Psychological Evaluation | 8 |
| 7 | Curriculum Vitae | 4 |
| 8 | American Psychological Association, Specialty Guidelines for Forensic Psychology | 37 |


All exhibits were attached to the original transcript.



IT IS STIPULATED AND AGREED by and between counsel for Plaintiff and counsel for Defendants that the deposition of DR. LAUREN RASMUSSEN may be presented remotely via Zoom pursuant to and in accordance with the Federal Rules of Civil Procedure, by and on behalf of the defendants, on May 4, 2021, before Beverly S. Hopkins, a Certified Shorthand Reporter, Certified Court Reporter, and Registered Professional Reporter; that the issuance of notice is waived, and that this deposition may be taken with the same force and effect as if all Federal Rules had been complied with.

IT IS FURTHER STIPULATED AND AGREED that any and all objections to all or any part of this deposition are hereby reserved and may be raised at the trial of this cause; and that the signature of the deponent is reserved.

(The deposition began at 8:03 a.m. and finished at 8:47 a.m.)

DR. LAUREN RASMUSSEN, produced, sworn, and examined as a witness on behalf of the defendants, testified and deposed as follows:



(Defendants' Exhibit Numbers 1, 2, 3, 4, 5, 6, 7, and 8 were marked for purposes of identification.)

DIRECT EXAMINATION

BY MR. REITZ:
**Q. Dr. Rasmussen, we've met before. I'm Kurt Reitz, and I'm here for your deposition today. We're taking your deposition a second time because you have been disclosed as a retained or hired expert in this case, do you understand that?**
A. Yes, sir.
**Q. Okay. And in your -- you previously gave your deposition on January 15, 2021, do you recall that?**
A. Yes, sir.
**Q. And when you were deposed in that case, you were deposed as a treating psychologist as I understand it, correct?**
A. Yes, sir.
**Q. All right. And you've now been retained as an expert, a forensic expert or a hired expert by the plaintiff's attorney, do you understand that?**



A. Yes.
**Q. Okay. Did you review your prior testimony from January 15, 2021?**
A. I have it in front of me. I don't think I read through it in its entirety.
**Q. Okay. So, Dr. Rasmussen, when you gave your testimony then, was it accurate and truthful as best you recall?**
A. Yes, sir.
**Q. Is there anything about that testimony that you, as you sit here today, would like to change?**
A. No, sir.
**Q. Okay. And then in terms of your current retention as a forensic expert or testifying expert in this case, who contacted you?**
A. I believe it was Mr. Sterbcow.
**Q. And do you know when?**
A. I don't recall the date. It was sometime after my deposition.
**Q. All right. And what did he ask you to do?**
A. He asked if I would be an expert in

Page 6

the case, and what it would take for that to occur.
**Q. All right. And did you explain to him what charges you would have in that regard, Doctor?**
A. Yes, sir. He was provided with our Professional Services Agreement.
**Q. All right. And your Professional Service Agreement sets out your charges, is that correct?**
A. Yes, sir.
**Q. Okay. And then you charged according to that Professional Service Agreement in this case, correct?**
A. Yes, sir.
**Q. And at least from the -- let's see. At least from the exhibits I have, Rich, if you put up Exhibit 2. Doctor, all I want to do is identify that Professional Services Agreement so we're talking about the same thing. And, Dr. Rasmussen, what we put up as Exhibit 2 in this case, is that your Professional Services Agreement?**
A. Yes, sir.

Page 7

**Q. So the charges you would make to Mr. Wagnon's counsel would be in line with that agreement, correct?**
A. Well, I guess sent with the Professional Services Agreement is our fee schedule. So it's not actually this exact document, but it's sent along with it.
**Q. Okay. All right.**
MR. REITZ: Rich, if you could take that one down for just a second. Let's try exhibit -- let's try Exhibit 3 for just a moment.
**Q. So Exhibit 3, if I understand, are the actual charges you made in this case?**
A. Yes, sir.
**Q. And that's pursuant to the fee schedule you talked about, correct?**
A. Yes, sir.
**Q. All right.**
MR. REITZ: And, Rich, if you'd take that one down for just a minute.
**Q. Okay. And then since your deposition on January 15, 2021, have you looked at any additional records in this case at all?**
A. Just the ones listed in my updated

Page 8

evaluation.
**Q. Okay.**
MR. REITZ: And looking at Exhibit 6, Rich, if you would put up Exhibit 6.
**Q. Is Exhibit 6 your updated evaluation?**
A. Yes, sir.
**Q. All right.**
MR. REITZ: And then scrolling down, Rich.
**Q. We get to a point where it lists the documents that you have reviewed.**
MR. REITZ: Stop right there.
**Q. Under Review of Medical Records, are those the additional documents you reviewed on page 3 under the section of Review of Medical Records?**
A. Yes, sir.
**Q. All right.**
MR. REITZ: Rich, if you'd take that down then so the Doctor and I can see each other. Perfect.
**Q. All right. So, Dr. Rasmussen, as I understand what has occurred here, you have seen Charles Wagnon a total of three times, correct?**

Page 9

A. Yes, sir.
**Q. And the first two times were as a treating physician, and the third time was as a retained or hired expert, correct?**
A. Yes, sir.
**Q. All right. And the first time you saw him was on February 4th, 2019, correct?**
A. Let me just verify the date.
**Q. Sure.**
A. Yes, sir.
**Q. And he underwent a full psychological assessment at that time, correct?**
A. That's correct.
**Q. And as a result of that full psychological assessment, you found in particular that Mr. Wagnon did not, did not have posttraumatic stress syndrome, correct?**
A. That's correct.
**Q. All right. And you talked to him by phone a week later, correct?**
A. Yes, sir.
**Q. And he was improving, correct?**
A. Yes, sir.
**Q. And, in fact, you released him to**

Page 10

**return to work, correct?**
A. Yes.
**Q. To go back to his previous employment as a tugboat captain, correct?**
A. Yes, sir.
MS. ABRAMSON: Let me just -- let me just make a -- just an objection just because she has already testified as to all of this in her first deposition, you know, in regards to her -- the first and second -- and second treatment and visits.
MR. REITZ: All right. And if you would have retained her as an expert, then we wouldn't have to do it twice, but you waited until afterwards. So let's go on with this.
**Q. You felt comfortable returning Mr. Wagnon to work, correct?**
A. Yes, sir.
**Q. And he did, in fact, return to work, correct?**
A. Yes, sir.
**Q. All right. And so at the time he returned to work, am I correct in saying there was absolutely no diagnosis of posttraumatic**

Page 11

**stress syndrome at that time, correct?**
A. That's correct.
**Q. Okay. So then you next saw him on January 10th, 2021, correct?**
A. Again find my documents so I can verify the date.
**Q. Of course.**
A. Sorry, I feel like my file has got more medical record requests at this time than actual notes. Let's see. I believe that's correct. I'm trying to find the exact document, but that sounds about right.
**Q. And on January 10, 2020, he reported to you that on December 18, 2019, he had removed himself from his job, is that correct?**
A. Yes, sir.
MS. ABRAMSON: Object to the form of the question.
**Q. And you didn't pull him out of service on December 18, 2019, did you?**
A. No, sir.
**Q. And he didn't consult with you before he pulled himself out of service, did he?**
A. He did not.

Page 12

**Q. Is it fair to say you had no involvement whatsoever in Mr. Wagnon's decision to stop working on December 18, 2019?**
A. That's correct.
MS. ABRAMSON: Object to the form of the question.
**Q. I'm sorry, I didn't hear you, Dr. Rasmussen.**
A. That's correct.
**Q. Then on January 14, 2020, I believe you talked to him by phone, and he agreed to counseling, correct?**
A. Yes, sir.
**Q. And at least as a result of that January 10, 2020, visit was there any additional testing at that time?**
A. No, sir.
**Q. Okay. The plan was, as of the phone call on January 14, 2020, that he would get eight to 12 counseling sessions with a goal of getting back to work, correct?**
A. That's correct.
**Q. Okay. And then since then, the only other time you've seen him then was on February**

Page 13

**22nd, 2021, at the request of plaintiff's counsel as a hired expert, correct?**
A. Yes, sir.
**Q. All right. And in that -- at the time you gave your deposition back as a treating doctor in this case on January 15, 2021, had you -- had you even read Dr. Anderson's records?**
A. I have not.
**Q. Okay. And now in your role as a consulting expert, you have reviewed those counseling notes, correct?**
A. That's correct.
**Q. All right. And can you tell me how many sessions Dr. Anderson had with Mr. Wagnon?**
A. Yes, sir. From what I was provided, eight visits.
**Q. He had eight visits from it appears January 21st, 2020, to April 13, 2020, correct?**
A. I have June 13, 2020, in my report.
**Q. Yeah, I think you're going to find it's actually April 13th.**
A. Is it April? I must have had a typo.
**Q. All right. And if I'm correct about that date, what we're talking about is the time**

Page 14

**between January, March, and April -- it's actually January, February, March, and April, I skipped a month, it's actually three months total of sessions over eight visits, correct?**
A. Yes, sir, that sounds right.
**Q. All right. And he got better over that time, correct?**
A. From what I understand in the records, yes, sir.
**Q. In fact, in the visit, the last visit, it indicates he had no symptoms relating at all to PTSD during the last three sessions, correct?**
MS. ABRAMSON: Object to the form of the question.
A. I don't have Dr. Anderson's records in front of me. All I have is my summary where it says treatment was terminated when symptoms were well managed. So I'm not certain that he was completely asymptomatic from my summary here, but from what I understand, his symptoms improved significantly.
**Q. So if the record indicates in a letter reporting on the treatment, a letter dated May 22nd, 2020, they denied return of symptoms**

Page 15

**over -- of PTSD over the last three sessions, do you have any reason to disagree with that?**
A. No, sir.
**Q. Fair to say he got better over those eight sessions, correct?**
A. Yes, sir.
**Q. And treatment was terminated with the symptoms well-managed, correct?**
A. Yes, sir.
**Q. And Dr. Anderson, was there anything in his notes, records, anything that indicated he ever restricted Mr. Wagnon's employment?**
A. I'm going off of memory here. I believe he said that his PTSD was chronic, but I don't recall him specifically restricting his employment.
**Q. Okay. So to answer my specific question, was there anything that Dr. Wagnon ever put -- I'm sorry, let me start that again. To answer my specific question, was there anything that Dr. Anderson ever put in his notes restricting Mr. Wagnon's employment?**
MS. ABRAMSON: Object to the question. Asked and answered.

Page 16

A. Not that I can recall.
**Q. And, Dr. Rasmussen, have you ever restricted Mr. Wagnon's employment?**
A. Yes, sir.
**Q. You have?**
A. Yes, sir.
**Q. And when did you restrict his employment?**
A. When I saw him the second time.
**Q. On January 10th, okay.**
A. Yes, sir.
**Q. And that was --**
A. I did --
**Q. I'm sorry, go ahead.**
A. I did not feel he was fit for duty at that time.
**Q. And that's why you recommended the sessions with the goal of getting him back to work, correct?**
A. Yes, sir.
**Q. All right. Did Dr. Anderson ever prescribe any kind of medication to your knowledge?**
A. No, sir.

Page 17

**Q. Did you ever prescribe any medication for Mr. Wagnon?**
A. No, sir.
**Q. To your knowledge has anyone, any healthcare provider ever prescribed any kind of medication for Mr. Wagnon as to the mental health issues he's claiming here?**
A. No, sir.
**Q. When you saw him on February 22nd, 2021, as a hired expert, how long did that visit take?**
A. Approximately one hour.
**Q. And when you saw him, his mood was pleasant?**
A. His mood was mildly anxious.
**Q. Okay. Let's go to your report of page --**
MR. REITZ: Exhibit 6, Rich.
THE VIDEOGRAPHER: Page 5, Kurt.
BY MR. REITZ:
**Q. Yeah, let me see if I can find it and help you out here. Okay, so let's go to page 5 of 6. And maybe it will be easier if we just go through the report. Under Behavioral**

Page 18

**Observations and Assessments, that -- those are your behavioral observations and assessments of Mr. Wagnon, correct?**
A. Yes, sir.
**Q. All right. And starting within the first paragraph the last four sentences, eye contact was good, correct?**
A. Yes, sir.
**Q. He was pleasant?**
A. Yes, sir.
**Q. He walked without difficulty?**
A. Yes, sir.
**Q. No pain -- no pain noticeable, correct?**
A. Correct.
**Q. Speech was normal?**
A. Yes.
**Q. Thought process was logical and goal directed?**
A. Yes.
**Q. And would you consider this to be a normal interview?**
A. Yes, sir.
**Q. All right. And then you also gave him**

Page 19

**three brief self-report measures as I understand it?**
A. Yes, sir.
**Q. And what was the point of those, Doctor?**
A. To have some kind of objective assessment of his current symptomology.
**Q. Okay. And what were the three self-report measures that he performed?**
A. Beck Depression Inventory-Second Edition, the Beck Anxiety Inventory, and the PCL-5.
**Q. Okay. And they were all within normal limits?**
A. Yes, sir.
**Q. And the results of this assessment indicate the absence of any current psychopathology, correct?**
A. That's correct.
**Q. And in plain English, does that mean he's doesn't have anything wrong from a mental health standpoint?**
A. In his current environment, yes, sir.
**Q. Okay. So in plain English, when you**

Page 20

**saw him on February 22nd, 2021, from a mental health standpoint he was normal?**
MS. ABRAMSON: Object to the form of the question.
A. He was asymptomatic, yes, sir.
**Q. Okay. And asymptomatic means an absence of symptoms or healthy or normal, correct?**
A. It's hard to use the term normal as a psychologist because that doesn't have a very well-defined boundary. But, yes, he was showing an absence of symptoms suggestive of any kind of mental health condition.
**Q. All right, thank you. So maybe we can't get it to plain English, but at least he had an absence of any kind of symptoms of any kind of mental health issue, correct?**
A. Yes, sir.
**Q. All right. So at least on February 22nd, 2021, did Mr. Wagnon have posttraumatic stress syndrome?**
A. In his controlled environment he was not showing symptoms of posttraumatic stress disorder.

Page 21

**Q. Okay. So let me ask it a slightly different way. On February 22nd, 2021, did Mr. Wagnon have any symptoms of posttraumatic stress disorder?**
A. No, sir.
**Q. All right. And the testing that was done on February 22nd, 2021, did any of that specifically look for objectively posttraumatic stress disorder?**
A. Yes, sir. The PCL-5 surveys the DSM-5 criteria for posttraumatic stress disorder.
**Q. Okay. So as I understand it now, and looking at your treatment and then examination as an expert of him as a whole, he's been tested -- written testing twice by you, correct?**
A. Yes, sir.
**Q. The first time on February 1st, 2019, where you found no traumatic -- no posttraumatic stress disorder, correct?**
A. That's correct.
**Q. And a second time on February 22nd, 2001, where you again found no posttraumatic stress disorder, correct?**
A. 2021. But, yes, sir.

Page 22

**Q. Yeah, let me ask you it again. Thank you. I'm terrible at this today. The second time on February 22nd, 2021, where you again did testing for a second time, and again found no posttraumatic stress disorder, correct?**
A. That's correct.
**Q. Okay. So currently, as I understand, Mr. Wagnon does not demonstrate any clinically significant symptoms to suggest a diagnosis of any kind of mental health condition, correct?**
A. That's correct.
**Q. And that includes posttraumatic stress disorder, correct?**
A. That's correct.
**Q. And so to be absolutely clear, you would agree that currently Mr. Wagnon does not have posttraumatic stress disorder, correct?**
A. No.
**Q. Is that correct?**
A. That is not correct.
**Q. Okay, explain if you would.**
A. What's that, I'm sorry? Explain, is that what you asked?
**Q. Yes.**

Page 23

A. So when in a controlled environment absent of his triggering stressors, Mr. Wagnon does not demonstrate any active symptoms of trauma. However, when placed among his stressors, as he showed whenever he went on the ship, he becomes very symptomatic and exhibits multiple signs of posttraumatic stress disorder, which is why we say in this controlled environment, absent of the stimuli, he's fine.
**Q. Okay. And do you have any records or notes or any kind of documentation of what Mr. Wagnon, of what his reaction was, when he was on the tugboat?**
A. I only had Mr. Wagnon's self-report.
**Q. What you have is what he told you, correct?**
A. Yes, sir.
**Q. Okay. And as it relates to Mr. Wagnon, would you agree that optimally -- optimally Mr. Wagnon, as part of his care, the goal would be to eliminate the obstacles that cause anxiety and return to prior functioning, correct?**
A. Yes, sir.

Page 24

**Q. In plain English get better, and he did, plus be able to go back to the same environment he was in before, correct?**
A. That's correct.
**Q. And part of that is -- as a psychologist is counseling or treatment on avoidance issues, correct?**
A. That's correct.
**Q. And did Mr. Wagnon have any specific avoidance treatment that you know of?**
A. The avoidance treatment is the prolonged exposure therapy that were conducted by Dr. Anderson.
**Q. So the eight visits over three months?**
A. Yes, sir.
**Q. Correct?**
A. Yes.
**Q. All right. So I want to make sure I understand this from a -- from a medical standpoint. Mr. Wagnon got no medical care whatsoever from this accident as you understand it, is that your understanding?**
MS. ABRAMSON: Object to the form of the question.

Page 25

A. That's correct.
**Q. And as to the posttraumatic stress syndrome, the diagnosis of PTSD, the written testing that you did in January of 2020, then again in February 2021, actually showed he did not have PTSD, is that correct?**
A. Correct.
**Q. And his MMPI, the personality test, in particular, was within normal limits, correct?**
A. Give me one second to look at this again.
**Q. Yeah.**
A. That is correct.
**Q. Okay. Doctor, could Mr. Wagnon benefit from more counseling, in that more counseling might enable him to address his avoidance issues and allow him to return to work?**
A. You know, I thought a lot about that. It's my opinion that he's undergone the treatment of choice right now for PTSD, which is prolonged exposure therapy. The other treatment modalities that have not been trialed would be in vivo exposure, which would mean actually putting him back on a boat, but he would need a provider

there with him, and virtual reality, which is not readily available in most areas. So in that regard, those treatments have been not trialed. I do not think Mr. Wagnon would benefit from additional prolonged exposure therapy.
**Q. So eight sessions are enough?**
A. According to the records from Dr. Anderson, eight sessions were enough to make him asymptomatic when not in vivo.
**Q. I mean, at least if I read the records correctly, he was actually asymptomatic after five sessions?**
MS. ABRAMSON: Object to the form of the question.
**Q. Correct?**
A. I don't have Dr. Anderson's records right in front of me, but if you told me that it said, you know, within three sessions he was asymptomatic, I believe you.
**Q. I think it's the last three sessions he was asymptomatic. So after five sessions, let me just try to be logical, that was the last time he indicated there was any kind of symptoms. That's a good sign, correct?**



A. Yes, sir. This is imaginal exposure.
**Q. And would you agree, Doctor, that written testing and confirmation by written testing showing a PTSD diagnosis is preferred?**
A. Yes, sir.
**Q. And we don't have that here, do we?**
A. He didn't ever show PTSD symptoms on objective testing.
**Q. Do you think it will be reasonable to try more counseling sessions?**
A. No, I don't think more counseling sessions. As I stated before, I think he would need in -- in real life exposure with a counselor, which is called in vivo, or virtual reality because he seems to have plateaued with the imaginal exposure that you can do in a traditional therapeutic environment.
**Q. I'm trying to understand how he plateaued if he got better on five sessions to a point where he had no symptoms at all.**
A. Would you like me to explain it to you?
**Q. Sure. Somebody gets five sessions. They have no symptoms at all. Sounds pretty good**



**to me. Explain.**
A. Sure. So we got him to the point where he could, to some degree, talk about and think about the accident and not be afraid of going in crowded places and not have symptom generalization, to grocery stores or other areas, his claustrophobia improved, and he was sleeping better, and his nightmares resolved. And so whenever he would think about it and talk about it, his symptoms were better, but that still does not put him on the actual boat.
**Q. Okay.**
A. He's better at discussing it and thinking about it and is not so symptomatic in life, but he's still terrified of the idea of going back on the boat. That's where the in life in vivo exposure has to take place.
**Q. Mr. Wagnon has a driver's license, correct?**
A. I believe so, yes, sir.
**Q. He drives a car?**
A. Yes, sir.
**Q. Does he have any issues driving an automobile?**



A. No, sir, not to my knowledge.
**Q. Do you know if he has a recreational boat?**
A. I believe he does.
**Q. Does he use the recreational boat?**
A. I believe he does.
**Q. Does he have any -- does he have any issue operating a recreational boat?**
A. Not to my knowledge, no, sir.
**Q. Going to -- back to Exhibit 6.**
MR. REITZ: Rich, if you'd put that up and put up page 6 of 6 so the doctor can see it. Right there.
**Q. The very first line, Dr. Rasmussen, you have down Mr. Wagnon's job is very dangerous. What is that based on?**
A. My understanding of the operations of a tugboat captain.
**Q. Is that any more dangerous than a school bus driver?**
A. From my understanding it can be.
**Q. How?**
A. I've worked with many a people injured on tugboats who have gone out the -- I can't

remember what it's called, it depends on which area you're going through, but I understand the currents are bad, they're pushing heavy machinery. There's all kinds of unknowns that can happen.

**Q. Doctor, I'm just trying to find out, you're a doctor, you've been hired as an expert. This is your expert's report, and you have in the report that his job is very dangerous. Is that based on any research?**

A. That's my impression of understanding what a tugboat captain does.

**Q. Is it based on any literature?**

A. I'm sure that I could find an article that said that it's dangerous being a tugboat captain, but I don't know that anybody has actually studied or conceptually defined what dangerous means with regard to this job.

**Q. Okay. And that's what I'm asking you right now. As you sit here right now, as you signed the report that said his job is very dangerous, do you have any literature that you can cite to support that?**

A. No, sir, you're asking me to



operationalize what dangerous means, and that can be subjective. I don't know that anybody has ever operationalized that term with regard to this job.

**Q. So whether a tugboat captain has any incidence of injury or danger any more than any other employee in a transportation industry, as of right now do you have any documentation, any literature to support that claim?**

MS. ABRAMSON: Object to the form of the question.

A. No, sir, I do not.

MR. REITZ: All right. I think that's all I have, Doctor. Again I get to say this a second time, thanks for putting up with me.

CROSS-EXAMINATION

BY MS. ABRAMSON:

**Q. I just have a couple follow-up questions. Doctor, what was your diagnosis of Mr. Wagnon when he saw you on February 5th, 2019?**

A. Was that my second visit with him?

**Q. That's the first one, the first visit.**

A. The very first time I saw him?

**Q. Yes. The very first time you saw him,**



**what was your diagnosis?**

A. Adjustment disorder with anxiety.

**Q. And is it more probable than not that that diagnosis was caused by the January vessel bridge accident that he described to you?**

A. Yes.

MR. REITZ: Counsel -- I'm sorry. I'll interrupt for a second, and I'll try to be quiet. I object to Counsel leading her own witness and asking leading questions of her own witness, which is improper.

A. Yes, ma'am.

**Q. Do you have an opinion as to what caused that condition that you diagnosed him with, that adjustment disorder with anxiety?**

A. Yes, ma'am.

**Q. And what is that?**

A. I believe it's actually even documented in my report. I believe it was related to the vessel accident.

**Q. Okay. When you saw him the second time on January 10th, 2020, what did you diagnose him with?**

A. I believe at that time that he had a



delayed response posttraumatic stress disorder.

**Q. Okay. And what did you diagnose him with after that visit, that second visit?**

A. Posttraumatic stress disorder.

**Q. And what was that diagnosis based on?**

A. His report of symptoms, and his visible reaction to discussing his symptoms.

**Q. Do you have an opinion as to what caused this new diagnosis of posttraumatic stress disorder in January of 2020?**

A. Yes, I do.

**Q. And what is that?**

A. You know, Mr. Wagnon returned to work. Whenever he wasn't at work, he was doing fine, and it slowly progressed to a point where he was nonfunctional while on the ship.

**Q. In your first and your second visit with Mr. Wagnon, in your clinical evaluation, did you find that he was faking or malingering any condition?**

A. No, ma'am.

**Q. Based on your expertise and your clinical contact with Mr. Wagnon during that first visit in 2019 and that second visit in**

Page 34

**2020, are you confident that all of the findings and conclusions in your report and that you've testified here today are accurate?**
A. Yes, ma'am.
**Q. And then you saw him a third time in March of 2021, is that correct?**
A. I saw him in February of 2021.
**Q. Oh, I'm sorry, February of 2021. What did you diagnose him with in February of 2021?**
A. My diagnosis is posttraumatic stress disorder in remission, not currently symptomatic.
**Q. And based on that evaluation and clinical contact in February of 2021, did you have any opinion in regards to him returning to work as a tugboat captain?**
A. Based on his response the prior time that he returned to work and his symptoms and his reported discussion with me that when he thinks about getting back on the boat he gets very anxious and gets -- his palms get clammy and he gets uncomfortable, I thought that he was not safe at his current state to return to work as a tugboat captain.
**Q. After participating in the treatment**

Page 35

**with you and with Dr. Anderson, if Mr. Wagnon chose to leave the maritime industry for employment that does not cause him psychological stress, as a clinical psychologist do you have any criticism of his decision?**
A. I do not. I would have if he hadn't tried to go back, but he tried.
**Q. Okay. Do you have any criticism of his decision not to return to employment in the maritime industry if it does cause him psychological stress?**
A. I do not.
**Q. When you saw Mr. Wagnon at his second visit, you did not perform any written testing, is that correct?**
A. Yes, ma'am.
**Q. And why is that?**
A. Because the purpose of me conducting the written testing the first time was for diagnostic clarification, but also to verify the validity of his self-report. And I was aware at that moment that he -- whenever I tested him the first time, that he was not a malingerer, and he was not attempting to misrepresent himself. And

Page 36

when he came in visibly shaken up and looking very different than he did the first time, I had no question about the validity of his reported symptoms.
**Q. And your report is actually dated March 8th, 2021, have you reviewed that in preparation for the deposition today?**
A. Yes, ma'am.
**Q. And you stand by all of your findings and opinions in that report?**
A. Yes, ma'am.
MS. ABRAMSON: That's all the questions I have.
REDIRECT EXAMINATION
BY MR. REITZ:
**Q. Doctor, a brief follow-up. Are there a code of ethics or codes of ethics that are applicable to your profession?**
A. Yes, sir.
**Q. And in particular as it relates to forensic psychology, testifying as an expert witness, are there specialty guidelines for forensic psychology?**
A. Yes, sir.

Page 37

**Q. And showing Exhibit 8.**
MR. REITZ: Rich, if you'd put up Exhibit 8 for just a second. I'll just tell you Exhibit 8 is the American Psychological Association Specialty Guidelines for Forensic Psychology. Do you adhere to those guidelines?
A. Yes, sir.
MR. REITZ: All right. That's all I have.
MS. ABRAMSON: That's it. Thank you.
THE REPORTER: Signature?
THE WITNESS: I would like to read and sign.
SIGNATURE RESERVED

Page 38

CERTIFICATE

I, Beverly S. Hopkins, a Certified Shorthand Reporter in the State of Illinois, Certified Court Reporter in the State of Missouri, and Registered Professional Reporter, DO HEREBY CERTIFY that pursuant to agreement between counsel, DR. LAUREN RASMUSSEN was presented before me via Zoom on May 4, 2021, who was first duly sworn by me to tell the whole truth of all knowledge touching upon the matter in controversy aforesaid so far as the witness should be interrogated concerning the same; that the witness was examined and said examination was taken down in shorthand by me and afterwards transcribed, signature having been reserved by agreement of counsel, and said deposition is herewith returned.

Dated this 5th day of May, 2021.

____________________________________

Beverly S. Hopkins, CSR, CCR, RPR
Illinois CSR License #084-004316
MO CCR #968

Page 39

DEPONENT SIGNATURE PAGE

I hereby affirm the foregoing deposition is a true and correct transcript (with any corrections I have made) of the testimony I gave in this regard, to the best of my knowledge.

__________________________

DR. LAUREN RASMUSSEN

IN THE COUNTY OF
STATE OF

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this _______day of_______________, 2021.

__________________________

NOTARY PUBLIC

My Commission expires .

Beverly S. Hopkins, CSR, RPR, CCR

Page 40

KEEFE REPORTING COMPANY
11 North 44th Street, Belleville, Illinois 62226
Reporter@keefereporting.com
618-277-0190 1-800-244-0190

May 5, 2021

Lewis, Kullman, Sterbcow & Abramson, LLC
Attn: Beth E. Abramson
601 Poydras Street, Suite 2615
New Orleans, LA 70130

In Re: CHARLES WADE WAGNON vs. PEORIA AND PEKIN UNION RAILWAY, and TAZEWELL & PEORIA RAILROAD, INC.

Dear Ms. Abramson:

Enclosed herewith please find a copy of the deposition transcript of DR. LAUREN RASMUSSEN taken in the above-captioned matter on May 4, 2021, along with the original signature page of same.

Please have DR. LAUREN RASMUSSEN read her deposition, note any corrections to be made on the provided sheets, sign the original signature page, and have her signature notarized where indicated. Since Attorney Kurt Reitz will have custody of the original transcript, please forward the original executed signature page and correction sheets to him within 28 days. Also, please provide all counsel of record with a copy of any changes the witness makes.

If you have any questions, please call me.

Sincerely yours,

Beverly S. Hopkins, CSR, CCR

CC w/Enc: Kurt E. Reitz, Esq.